UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DELTA T, LLC d/b/a
BIG ASS FAN COMPANY,

     Plaintiff,

v.                                    Case No. 8:19-cv-1731-VMC-SPF

DAN'S FAN CITY, INC., and
TROPOSAIR, LLC,

     Defendants.
_____/

<u>**ORDER**</u>

This matter is before the Court upon consideration of Defendants Dan's Fan City, Inc., and TroposAir, LLC's <u>Daubert</u> Motion to Disqualify Lance G. Rake and Exclude His Testimony (Doc. # 140), and <u>Daubert</u> Motion to Disqualify Charles L. Mauro and Exclude His Testimony (Doc. # 141), both filed on January 11, 2021. Plaintiff Delta T, LLC, responded to the Motions on January 25, 2021. (Doc. ## 146; 147). For the reasons set forth below, the Motion to Exclude Rake is granted in part and denied in part, and the Motion to Exclude Mauro is denied.

**I.   Background**

This is a patent case that arose out of Defendants' alleged infringement of three of Delta T's patented designs

1

of a modern residential ceiling fan, known as the Haiku fan. (Doc. # 65 at ¶¶ 8, 20). Delta T initiated this suit in the District of Maryland on December 14, 2018. (Doc. # 1). Following transfer to this Court on July 17, 2019, the case proceeded through discovery. (Doc. # 30).

Delta T intends to rely on Lance G. Rake and Charles L. Mauro's expert opinions and testimony at trial. (Doc. ## 128-11, 128-12, 128-13, 128-14). Rake is an industrial designer, design researcher, and professor with forty-six years' experience in the industry. (Doc. # 128-11 at ¶ 5-6). Rake's report utilizes the Gestalt perception theory to demonstrate whether the Haiku fan and Defendants' ceiling fan, the Vogue fan, are substantially the same. (Id. at ¶¶ 25, 29). Rake concludes that the Vogue fan "is substantially the same in overall appearance as" Delta T's three patents. (Id. at ¶ 46). Rake also opines on the amount of profit he believes Delta T would have made absent Defendants' alleged infringement. (Doc. # 153 at ¶ 95-100).

Mauro, on the other hand, served as the president of a design research consulting firm for forty-five years, and for the past eight years, has served as the chairman of the Design Protection Committee for the Industrial Designers Society of America. (Doc. # 128-12 at ¶¶ 1, 3). Mauro was tasked with

"design[ing] an online survey for a sample of randomly chosen participants to evaluate whether, 'in the eye of an ordinary observer giving such attention as a purchaser usually gives," the ceiling fan depicted in Delta T's patents and Defendants' Vogue ceiling fan "are substantially the same." (Id. at ¶ 11; Doc. # 128-13 at ¶ 11; Doc. # 128-14 at ¶ 11). Mauro found that the results of the online survey "indicate that an 'ordinary observer' of ceiling fans would find the accused Vogue design to be substantially the same in overall appearance as the [Delta T patented designs] in view of the relevant prior art, and thus infringing." (Doc. # 128-12 at ¶ 14; Doc. # 128-13 at ¶ 14; Doc. # 128-14 at ¶ 14).

In the Motions, Defendants seek to exclude the expert opinion and testimony of both Rake and Mauro. (Doc. ## 140; 141). Delta T has responded (Doc. # 146; 147), and the Motions are now ripe for review.

## II.  **Discussion**

Federal Rule of Evidence 702, which governs the admission of expert testimony in federal courts, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

3

> based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied
> the principles and methods to the facts of the case.

Fed. R. Civ. P. 702. In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the Supreme Court held that federal district courts must ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. <u>Id.</u> at 589-90. This analysis applies to non-scientific expert testimony as well. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147-49 (1999). District courts are tasked with this gatekeeping function so "that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation expert testimony." <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291 (11th Cir. 2005) (citation omitted).

In the Eleventh Circuit, trial courts must engage in a "rigorous three-part inquiry" in determining the admissibility of expert testimony. <u>Hendrix v. Evenflo Co.</u>, 609 F.3d 1183, 1194 (11th Cir. 2010). Specifically, courts must assess whether:

> (1) the expert is qualified to testify competently
> regarding the matters he intends to address; (2)
> the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined
> by the sort of inquiry mandated in <u>Daubert</u>; and (3)
> the testimony assists the trier of fact, through

the application of scientific, technical, or
specialized expertise, to understand the evidence
or to determine a fact in issue.

Id. (citation omitted).  "The party offering the expert has
the burden of satisfying each of these three elements by a
preponderance of the evidence." Adams v. Magical Cruise Co.,
No. 6:15-cv-282-RBD-TBS, 2016 WL 11577631, at *2 (M.D. Fla.
Oct. 21, 2016) (citing Rink, 400 F.3d at 1292).

   **A.   Rake's Expert Opinion and Testimony**

   The Court will address each aspect of the three-part
inquiry as to Rake's expert opinion and testimony below.

   **1.   Rake's Qualifications**

   First, the Court must assess whether Rake is qualified
to testify about the matters he intends to address. City of
Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th
Cir. 1998). An expert may be qualified "by knowledge, skill,
experience, training, or education." Fed. R. Civ. Evid. 702.
"Determining whether a witness is qualified to testify as an
expert 'requires the trial court to examine the credentials
of the proposed expert in light of the subject matter of the
proposed testimony.'" Clena Invs., Inc. v. XL Specialty Ins.
Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v.
Glaxo Wellcome Inc., 239 F. Supp. 2d 1308, 1314 (N.D. Ga.
2002)). "This inquiry is not stringent, and so long as the

5

expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." Id. (citations omitted).

Here, Defendants do not appear to dispute Rake's qualifications as to his design expertise. (Doc. # 140; Doc. # 146 at 1 n.2). Indeed, Rake has extensive experience in the industry – spanning over forty-five years. (Doc. 128-11 at ¶ 6). Rake has worked as a professor of industrial design since 1980. (Id. at ¶ 6-7). Rake also has sixteen years' experience working as a design consultant for Infusion Design, where he "designed commercial and consumer products, transportation interiors, packaging, and exhibits for over [eighty] clients." (Id. at ¶ 8). Examples of products he has designed include commercial electronics, consumer products, lawnmowers, and airplane and boat interiors. (Id.). Rake also has particularized knowledge of fan design, in that he directed a design research project on fan designs at the University of Kansas Center for Design Research in 2006, which "involved extensive product and market research and resulted in multiple innovative fan design proposals." (Id. at ¶ 13).

Given Daubert's lenient standard, and Defendants' lack of opposition, the Court finds that Rake's experience in the design industry makes him "minimally qualified" to testify

about industrial design generally, as well as the similarity between different ceiling fan designs. See Oralabs, Inc. v. Kind Grp. LLC, No. 13-cv-00170-PAB-KLM, 2015 WL 4694138, at *3 (D. Colo. Aug. 7, 2015) ("Thus, provided that Kind Group lays an adequate foundation for Mr. Kapec's knowledge of [G]estalt theory as applied in the field of industrial design, Mr. Kapec is qualified to discuss the theory in the context of the design of the accused product.").

However, Defendants do object to Rake's qualifications regarding Delta T's alleged lost profits, arguing that he is not an economic expert. (Doc. # 140 at 9-10). Delta T responds: "Although Defendants also challenge Rake as to testifying about damages, this response does not address that issue as the Motions for Summary Judgment exclude, and do not address or go to, the issue of damages – a question that is not yet before the Court." (Doc. # 146 at 11 n.8). Yet, the issue is before the Court. Defendants' Motion does not only address the admissibility of Rake's opinion on summary judgment. Indeed, the Motion addresses his ability to testify at trial as well. (Doc. # 140 at 1). Because Delta T seeks damages in the operative complaint, whether a party's expert is qualified to testify about damages is relevant. (Doc. # 65 at ¶ 28).

Here, Rake has failed to include any qualifications in his report related to his ability to determine a corporation's lost profits. (Doc. ## 128-11; 153). Although Rake is an expert in industrial design, he is not an expert in accounting, business, or finance. Accordingly, the Court finds that Rake is not minimally qualified to testify as to Delta T's purported lost profits, and his expert opinion and testimony are excluded to that extent. See Chill v. Calamos Advisors, LLC, 417 F. Supp. 3d 208, 250 (S.D.N.Y. 2019) ("Pomerantz simply is not qualified to offer admissible expert testimony on the issue of . . . profitability. As detailed above, Pomerantz does not have a degree in accounting or economics; he does not have a CPA license; he has never taught a course in accounting or economics; and he has never published a peer-reviewed article in an accounting or economics journal."); Hosp. of Louisa, Inc. v. Sergent, No. 0:10-CV-9-HRW-REW, 2012 WL 13018834, at *14 (E.D. Ky. Jan. 4, 2012) ("Hazelett is not qualified to opine about lost profits, and her testimony is not reliable on this record. . . . She may know about medical insurance and some ledger accounting, but nothing shows that Hazelett is trained or otherwise credentialed to forecast fiscal performance of an entity over

time. Nothing in her role as temporary office manager suggests qualification as an economic loss expert.").

### 2.  **Reliability of Rake's Methodology**

Next, the Court must determine whether Rake's methodology is reliable. <u>City of Tuscaloosa</u>, 158 F.3d at 562. Because the Court has already excluded Rake's opinion and testimony as to lost profits, it will address only his opinion regarding the similarity of the relevant ceiling fans' designs. Defendants argue that Rake's opinions are unreliable because "they are founded on incorrect, rather than reliable principles." (Doc. # 140 at 3). Specifically, Defendants argue that Rake should not be allowed "to compare the accused device to [Delta T's] product, rather than to the designs of the asserted patents," and that Rake erroneously focuses on the fans as viewed from below, rather than on the designs in their entirety. (<u>Id.</u>). Delta T counters that "Professor Rake did not opine that only the bottom view was relevant," and that Rake's methodology is reliable. (Doc. # 146 at 3-4 (emphasis omitted)).

"Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." <u>United States v.</u>

Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation and emphasis omitted). There are four recognized, yet non-exhaustive factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted). A district court may take other relevant factors into consideration as well. Id. "Although an opinion from a non-scientific expert should receive the same level of scrutiny as an opinion from an expert who is a scientist, some types of expert testimony will not naturally rely on anything akin to the scientific method, and thus should be evaluated by other principles pertinent to the particular area of expertise." Washington v. City of Waldo, No. 1:15-CV-73-MW/GRJ, 2016 WL 3545909, at *3 (N.D. Fla. Mar. 1, 2016) (citation omitted).

Here, Defendants challenge Rake's methodology by arguing that it "is fundamentally flawed under the 'ordinary observer' test set out in Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008)." (Doc. # 140 at 2).

Specifically, Defendants argue that Rake erroneously compares the Vogue fan to the Haiku fan, rather than the specific fan designs contained in the patents. (Id. at 3) And, Rake allegedly incorrectly analyzes the similarity of the fans' designs as viewed from below, rather than based on their designs in the entirety. (Id. at 3).

Although it is true that Rake discusses the similarity of the two finished products, a majority of his analysis is based on comparing the Vogue fan and the designs from Delta T's patents. (Doc. # 128-11). Indeed, Rake does not conclude that the finished products are similar, but rather that the Vogue fan is similar to the designs in the patents: "It is my opinion that the Vogue accused design is substantially the same in overall appearance as the '757, the '027, and the '004 Patents." (Id. at ¶¶ 46, 72-77). Rake explains that he came to that conclusion based on a comparison of the Vogue fan and the designs in the patents – not the finished product of the Haiku fan. (Id.). And, in discussing the differences between prior art and Delta T's fan, Rake looks to the patent designs as well. (Id. at ¶ 57) ("In stark contrast to traditional ceiling fan designs where the motor, blades, blade irons, and fasteners are each distinctive elements, the claim of the '757 Patent appears as a single, visually

integrated form, exhibiting both Surface Tangency and Surface Continuity."). Therefore, the Court declines to exclude Rake's method as unreliable for this reason.

Regarding Defendants' argument that Rake erroneously focuses his analysis on the perspective of the fans as viewed from below, rather than the design of the fans in their entirety, the Court disagrees and finds Rake's methodology sufficiently reliable. In his report, Rake explains that he employed Gestalt design principles in determining how an ordinary observer would perceive the relevant fans. (Doc. # 128-11 at ¶ 25-30). Defendants do not appear to attack Rake's use of this theory, but rather argue that he should not be basing him opinion solely from the bottom perspective of the fans. (Doc. # 140 at 3). To the extent that Rake's opinion focuses on this perspective alone, this goes to the weight and credibility of his testimony, not its reliability or admissibility. See ADC Telecomms., Inc. v. Panduit Corp., 200 F. Supp. 2d 1022, 1034 (D. Minn. 2002) (considering that an ordinary observer would view the product in question from the bottom in determining whether it was infringing). Defendants can question Rake about the overall designs of the fans on cross examination. Accordingly, the Court declines to exclude Rake's testimony or opinion as unreliable.

### 3.   <u>Assistance to the Trier of Fact</u>

Finally, Rake's testimony must assist the trier of fact. Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average [layperson]." <u>Frazier</u>, 387 F.3d at 1262. "[T]he court must 'ensure that the proposed expert testimony is relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the proposing party's case.'" <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted) (alteration in original). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Frazier</u>, 387 F.3d at 1262-63 (citation omitted).

Defendants argue that Rake's opinion and testimony should be excluded because they would not assist the trier of fact. (Doc. # 140 at 2). Specifically, Defendants contend that Rake's opinions are conclusory and straightforward such that no expert testimony is needed. (<u>Id.</u>). Delta T responds that Rake's opinion is not conclusory, as "he is opining, based on an established body of science, that certain features are likely to stand out to a prospective purchaser (ordinary observer) and that these features are what most distinguish

13

the patented designs and the infringing product, on the one hand, [and] from the prior art, on the other." (Doc. # 146 at 11). Delta T also argues that this case is complex such that Rake's testimony will assist the factfinder. (Id. at 9-10).

The Court finds that the patented designs and alleged infringing products are not so straightforward that Rake's testimony would be unhelpful to a jury. In his report, Rake explains and analyzes principles of industrial design – of which laymen are likely unaware. (Doc. # 153 at ¶ 25-30). Although it is true that jury members would themselves be able to compare two objects to determine their similarity, it would help a jury to understand why certain designs might appear similar, and whether differences in designs actually impact their overall appearances. See Apple Inc. v. Samsung Elecs. Co., No. 11-CV-01846-LHK, 2018 WL 1586276, at *11 (N.D. Cal. Apr. 2, 2018) ("[T]he Court agrees with Apple's underlying point that how a designer would understand the patent and how a consumer would view the products are relevant to the test that the Court has identified."); Pac. Coast Marine Windshield Ltd. v. Malibu Boats LLC, No. 6:12-cv-33-JA-DAB, 2013 WL 12156465, at *10 (M.D. Fla. Jan. 4, 2013) ("The Court finds that Mr. Anders' comparison of the design patent, the commercial embodiment, and accused product, and

his analysis of the prior art (with appropriate instructions) may assist the jury in deciding PCMW's infringement claims."). Accordingly, the Court denies the Motion as to this requested relief.

Regarding the alleged conclusory nature of Rake's opinion and testimony, an expert "opinion is not objectionable just because it embraces an ultimate issue." Clarke v. HealthSouth Corp., No. 8:14-cv-778-VMC-AAS, 2021 WL 129821, at *3 (M.D. Jan. 14, 2021) (quoting Fed R. Evid. 704(a)). However, an "expert may not express a legal opinion as to the ultimate legal issue." Plexxikon Inc. v. Novartis Pharms. Corp., No. 17-cv-04405-HSG, 2020 WL 2301213, at *2 (N.D. Cal. May 8, 2020).

In his report, Rake states: "In my opinion, this comparison considerably strengthens my conclusion that the Vogue accused design infringes each of the Patented Designs." (Doc. # 128-11 at ¶ 39). To the extent that Rake plans to opine that the Vogue ceiling fan infringes on Delta T's patented designs or that they are "substantially similar" under Egyptian Goddess, this is an impermissible legal conclusion, and is therefore excluded. See Apple Inc. v. Corellium, LLC, No. 19-81160-cv-Smith/Matthewman, 2020 WL 7414523, at *3 (S.D. Fla. July 29, 2020) (excluding a non-

lawyer expert's legal conclusions); <u>Habersham Plantation</u> <u>Corp. v. Art & Frame Direct, Inc.</u>, No. 10-61532-CIV, 2011 WL 4055376, at *3 (S.D. Fla. Sept. 13, 2011) ("While Robertson is qualified to base his opinion on his personal knowledge of the industry, a jury must decide whether the parties' products are substantially similar, based upon the evidence presented and the argument of counsel.").

Still, Rake may testify about general principles of industrial design, including the Gestalt perception theory, and their application to the instant case, as well as how these principles might affect how an observer perceives the Vogue fan and the patented designs. <u>See</u> <u>Moore v. Wright Med.</u> <u>Tech., Inc.</u>, No. 1:14-cv-62, 2016 WL 1316716, at *10 (S.D. Ga. Mar. 31, 2016) ("Truman will not be allowed to testify to legal conclusions in this manner at trial. Though the legal conclusions contained in these opinions will not be allowed, . . . the Court has found that Truman employed sufficiently reliable methodology to arrive at her factual conclusions, which she will be allowed to testify to.").

**B.   <u>Mauro's Expert Opinion and Testimony</u>**

Next, Defendants move to exclude Mauro's expert opinion and testimony. (Doc. # 141).

## 1.  __Mauro's Qualifications__

As previously noted, the Court must first assess whether Mauro is qualified to testify about the matters he intends to address. City of Tuscaloosa, 158 F.3d at 563. Defendants argue that Mauro "is not qualified to testify as a survey expert" because he is an industrial engineer and has not demonstrated that he has the basic skills required to present survey evidence. (Doc. # 141 at 2-3). Delta T responds that Mauro is qualified as a survey expert based on his education and professional career. (Doc. # 147 at 3-4).

The Court finds that Mauro's education and experience are sufficient to meet Daubert's lenient standard. See Clena, 280 F.R.D. at 661 (explaining that the qualifications "inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility"). Indeed, Mauro has a master's degree in human factors and ergonomic research, and those studies "focused on advanced user research methodologies." (Doc. # 128-12 at ¶ 6). His coursework "included, in part, advanced research study design, respondent recruiting methods, demographic profile development, sampling methods, data scrubbing methods, data validation processes, lab-based testing, one-on-one interview

methodologies, *survey design, survey validation*, and pilot testing." (Id. (emphasis added)). Beyond his education, Mauro has extensive experience conducting surveys within the design research field. (Id. at ¶ 1-5). Mauro has "managed over 3,000 design research programs" over his forty-five-year career, which have included managing "the design, development, validation[,] and fielding of hundreds of complex online surveys." (Id. at ¶ 7).

Mauro's education and experiences thus make him "minimally qualified" to opine on the online survey he devised. See Taylor v. Trapeze Mgmt., LLC, No. 0:17-cv-62262-KMM, 2019 WL 1977514, at *2 (S.D. Fla. Feb. 28, 2019) (finding an expert who had "conducted over 500 secondary research projects and 6,000 focus groups" qualified to testify on the marketing research survey he conducted). Therefore, the Motion is denied regarding Mauro's qualifications.

## 2.   **Reliability of Mauro's Methodology**

Next, the Court must determine whether Mauro's methodology is reliable. City of Tuscaloosa, 158 F.3d at 562. In their Motion, Defendants argue that Mauro's methodology is flawed because his test "is not generally accepted in the relevant scientific community," and strays too far from the ordinary observer test set out in Egyptian Goddess. (Doc. #

141 at 4-6). Delta T responds that these contentions go to weight, not admissibility, and that although Mauro's survey is novel in the patent context, novelty does not automatically warrant exclusion. (Doc. # 147 at 6-10).

"Surveys . . . are admissible, if they are pertinent to the inquiry, upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods." Off Lease Only, Inc. v. Lakeland Motors, LLC, No. 6:18-cv-1555-RBD-DCI, 2019 WL 6910162, at *3 (M.D. Fla. Dec. 19, 2019) (citation omitted). To assess survey reliability, relevant factors courts consider include whether: "(1) the population was properly chosen and defined; (2) the sample chosen was representative of that population; (3) the data gathered were accurately reported; and (4) the data were analyzed in accordance with accepted statistical principles." Taylor, 2019 WL 1977514, at *2 (citation omitted). However, "objections based on flaws in the survey's methodology are [usually] properly addressed by the trier of fact." PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 123 (4th Cir. 2011).

Here, Mauro developed "an online survey for a sample of randomly chosen participants to evaluate whether, 'in the eyes of an ordinary observer giving such attention as a

19

purchaser usually gives' the ceiling fan depicted in [Delta T's patents] . . . and the . . . Vogue ceiling fan design 'are substantially the same' and their 'resemblance is such as to deceive an observer . . . to purchase one supposing it to be the other.'" (Doc. # 128-12 at ¶ 11). Mauro concluded that "[t]he results of the online survey indicate that an 'ordinary observer' of ceiling fans would find the accused Vogue design to be substantially the same in overall appearance as the patented . . . design[s] in view of the relevant prior art, and thus infringing." (Id. at ¶ 14).

In conducting the survey, Mauro selected 300 random, screened participants, half of which "were randomly assigned to a test condition or control condition." (Doc. # 128-12 at ¶¶ 13, 15). The respondents were first tasked with completing "a paired rating scale task designed to quantify and compare [the] perceived similarity/difference between the patented design and the accused design, and the patented design compared to the most relevant prior art designs." (Id. at ¶ 16). These images were presented in a randomized order, and the respondents rated them on a scale from "0 (Completely Identical) to 100 (Completely Different)." (Id.). Thereafter, participants "were shown each view of the patented and accused design (or patented and control design in the control

condition) and were asked, 'are the overall visual designs of the two ceiling fans above 'substantially the same' or 'not substantially the same.'" (Id. at ¶ 17). Finally, the respondents completed a deception task, in which they were shown the patented fan design and told to give it as much attention as if they had decided to purchase it. (Id. at ¶ 18). The participants were then shown an unrelated two-minute video to minimize short-term memory recall, and were provided with a number of photos of fans. (Id. at ¶ 18). The patented fan shown prior to the video was omitted from the photos, and the respondents were asked to select that first fan from the list, with the following option included: "[T]he ceiling fan design I imagined purchasing is not in the list." Id. The results of these tasks were then put through a number of statistical analyses. (Id. at ¶ 20-27).

These methodologies are sufficiently reliable under Daubert. See Banta Props., Inc. v. Arch Specialty Ins. Co., No. 10-61485-CIV-DIMITROULEAS/SNOW, 2011 WL 13096149, at *4 (S.D. Fla. Dec. 20, 2011) ("Quelette's method was not so unreliable that the Court can rule as a matter of law that the jury should not hear his opinion."). Indeed, Defendants do not attack any of the specific processes utilized in developing the survey, the statistical analyses employed in

compiling the data, the pool of participants, or the accuracy of the results. (Doc. # 141). Rather, Defendants argue that this survey method is not generally accepted because it has not been utilized in patent cases before. (Id. at 4). Regardless of whether this specific survey has been used in a patent case, the methodology of the survey itself is sufficiently reliable. See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 829 (D. Minn. 2011) ("While the specific application of [this methodology] in this precise context may be novel, the underlying principles and methods are not."); see also Ass Armor, LLC v. Under Armour, Inc., No. 15-cv-20853-Civ-COOKE/TORRES, 2016 WL 7156092, at *3 (S.D. Fla. Dec. 8, 2016) ("Survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant." (citation omitted)).

Mauro selected a large, random sample of participants and included a significant control group. (Doc. # 128-12 at ¶ 13-16). Any other objections that Defendants might have regarding the technical aspects of Mauro's survey go to weight, not admissibility. See Edmondson v. Caliente Resorts, No. 8:15-cv-2672-SDM-TBM, 2017 WL 10591833, at *11 (M.D. Fla. Aug. 31, 2017) ("Objections to the technical validity of the survey properly go to the weight to be accorded to the survey

rather than to its admissibility."); see also Pods Enters., Inc. v. U-Haul Int'l, Inc., No. 8:12-cv-1479-JDW-MAP, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014) ("These criticisms likewise go to the weight of her opinions, not their admissibility. Vigorous cross-examination will allow PEI to address the deficiencies of Dr. Wood's report, a process that should not be supplanted by Daubert's gatekeeper role.").

And, whether the test comports with the ordinary observer test set out in Egyptian Goddess is best addressed in determining whether the results of this survey would aid the trier of fact, not in assessing reliability. Accordingly, the Motion is denied as to methodology.

### 3.   Assistance to the Trier of Fact

Lastly, the Court addresses whether Mauro's expert opinion and testimony would be helpful to a trier of fact. Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010). Defendants argue that Mauro's testimony would not be helpful because the test he designed: (1) strays too far from the test set out in Egyptian Goddess; (2) did not ask the participants why they found Delta T's patented design and the Vogue fan substantially similar or not substantially similar; (3) included an allegedly irrelevant memory test; and (4) is rife with flaws. (Doc. # 141 at 6–12). Additionally,

Defendants argue that the ceiling fans at issue are not unduly complex, such that Mauro's testimony would not assist the trier of fact but would rather confuse them. (Id. at 13-14).

Delta T responds that these contentions largely go to the question of weight, not admissibility, that "the comparative technique of the surveys is conceptually and scientifically sound under [Egyptian Goddess's] restatement of the . . . ordinary observer test," and that the "memory-clearing task used . . . is common survey practice." (Doc. # 147 at 6, 12, 15). And, with regard to the "substantially similar" question, Delta T argues that "the survey respondents were asked exactly what the jury will be asked, so this is not a basis for precluding Mauro's testimony." (Id. at 14 (emphasis omitted)).

The Court agrees with Delta T that a number of these objections to Mauro's opinion and testimony go to weight, rather than admissibility. See TV Interactive Data Corp. v. Sony Corp., 929 F. Supp. 2d 1006, 1021-22 (N.D. Cal. 2013) ("Issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." (citation omitted)); Fujifilm Corp. v. Motorola Mobility LLC, No. 12-cv-03587-WHO, 2015 WL

1737951, at *5 (N.D. Cal. Apr. 8, 2015) ("[T]he framing of survey questions 'is generally an issue of weight, not admissibility.'" (citation omitted)). Defendants may attack these supposed flaws in Mauro's survey on cross examination. See Barry v. Medtronic, Inc., No. 1:14-cv-104, 2016 WL 7665773, at *3 (E.D. Tex. July 19, 2016) ("Medtronic's last arguments provide no basis to exclude Dr. Neal's survey. Cross-examination will disclose the alleged error to the jury. Any alleged inadequacies go to the weight of the survey, not its admissibility.").

The Court finds that a survey explaining to what extent random individuals found the patented design and prior art, as well as the Vogue fan, to be similar could be helpful in determining whether Defendants infringed Delta T's patents. See Egyptian Goddess, 543 F.3d at 670 (explaining that a patent is infringed if, "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other"); see also Gavrieli Brands LLC v. Soto Massini (USA) Corp., No. 18-462 (MN), 2020 WL 1443215, at *3 (D. Del. Mar. 24, 2020) (explaining that an expert in design helpfully "performed a patent-by-patent

25

comparison of the patented designs with images of the accused shoe, [and] a physical sample of the accused shoe and the closest prior art" at trial); Degelman Indus., Ltd. v. Pro-Tech Welding & Fabrication, Inc., No. 06-CV-6345, 2011 WL 6754051, at *9 (W.D.N.Y. May 27, 2011) (finding an expert's opinion describing the perspective of an ordinary observer helpful to the fact finder in determining whether the defendant's product infringed on the plaintiff's patented designs). Accordingly, the Motion is denied.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants Dan's Fan City, Inc., and TroposAir, LLC's Daubert Motion to Disqualify Lance G. Rake and Exclude His Testimony (Doc. # 140) is **GRANTED** in part and **DENIED** in part as set forth herein.

(2)   Rake's expert opinion and testimony are excluded to the extent he opines on Delta T's purported lost profits. Rake's opinion and testimony are also excluded to the extent he intends to make an ultimate legal conclusion as to whether Defendants' products infringe on Delta T's patents. However, Rake may testify as to industrial design principles that might assist the jury in determining how an ordinary observer would perceive the

ceiling fans in question, and how those design principles apply to the instant case.

(3) Defendants' <u>Daubert</u> Motion to Disqualify Charles L. Mauro and Exclude His Testimony (Doc. # 141) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>9th</u> day of February, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE