UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DELTA T, LLC d/b/a DAN'S BIG
ASS FAN COMPANY,

        Plaintiff,

v.                               Case No. 8:19-cv-1731-VMC-SPF

DAN'S FAN CITY, INC., HOME
DEPOT U.S.A. INC. d/b/a The Home Depot,
and TROPOSAIR, LLC,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a design patent infringement case pertaining to three-bladed residential ceiling fans. Plaintiff Delta T, LLC ("Plaintiff" or "Delta T") designed the Haiku fan, a fan with three blades (or airfoils) that blend into a center hub, creating the impression of a seamless fan with a horizontal plane profile (*see* Doc. 65 (Second Amend. Cmplt.) at ¶ 9). Between 2009 and 2018, Delta T obtained three design patents related to the Haiku fan and its lower-priced relative, the L-series fan (Doc. 128-1 (Dorisio Decl.) at ¶¶ 5-9). Meanwhile, Defendants Dan's Fan City, Inc. and its affiliate TroposAir, LLC ("Defendants," "Dan's Fan City," or "TroposAir") began selling a similar fan known as the Vogue fan in 2016 (Doc. 124-1 (Hibbeln Decl.) at ¶ 6; Doc. 128-17 (Hibbeln Depo.), Ex. 74 at 4). The Vogue fan costs less than either the Haiku fan or the L-series fan (Second Amend. Cmplt. at ¶ 15; Hibbeln Depo., Ex. 14). After Defendant Home Depot U.S.A. Inc. partnered with Defendants to sell the Vogue fan online, Delta T sued, asserting design patent infringement claims as to its three

patents (*see* Second Amend. Cmplt.).[1]   Defendants answered and asserted affirmative defenses, including invalidity and double patenting (Docs. 73-74).   The parties proceeded through discovery and are preparing for a June jury trial.

Plaintiff seeks summary judgment against Defendants on its claims of patent infringement and willful patent infringement (Doc. 129), and Defendants move for summary judgment on all Plaintiff's claims against them (Doc. 124).   Before the Court are the following cross-filings: Defendants' Motion for Summary Judgment (Doc. 124); Plaintiff's Response (Doc. 157); Defendants' Reply (Doc. 142); Plaintiff's Motion for Summary Judgment (Docs. 128, 129); Defendants' Response (Doc. 143); and Plaintiff's Reply (Doc. 148).[2]   The undersigned recommends that Delta T's summary judgment motion (Doc. 128) be denied and Defendants' summary judgment motion (Doc. 124) be granted in part and denied in part.

## I.    BACKGROUND

Delta T is an online, Kentucky-based company that designs, engineers, manufactures, and sells residential and commercial ceiling fans and lighting (Second Amend. Cmplt. at ¶ 2). In 2008, electronics engineer Ernest Noble ("Noble") set out to create a fan that is "a functional yet minimalist work of art" with "an aesthetically beautiful, sleek and fluid design having three thin, curved blades blended seamlessly into the fan's center rotor." (*Id.* at ¶ 9). He called his creation the Haiku fan and filed a patent application for its design; the United States Patent and Trademark Office ("USPTO") issued Patent No. D614,757 (the "'757

---

[1]    Plaintiff reached a settlement agreement with Defendant Home Depot USA, Inc. in January 2020 (*see* Doc. 88).  At the parties' request, the Court dismissed Plaintiff's claims against Home Depot with prejudice (Doc. 89).

[2] Plaintiff filed its response to Defendants' summary judgment motion under seal with the Court's permission (Docs. 135, 157) as well as 13 of its exhibits in support of its summary judgment motion (Docs. 128, 130, 132).

Patent") for the Haiku design on April 27, 2010 (*Id*. at 12; Doc. 128-2).  According to Lance Rake ("Rake"), an industrial designer and one of Delta T's experts, the '757 Patent "departs conspicuously from previous designs" because of its overall integration (Doc. 128-11 (Rake Report) at 13).  Under the '757 design, "[t]he motor housing was no longer a distinguishable visual feature.  The blades were not flat, planar shapes (found on conventional ceiling fans), but rather curved, flowing airfoils.  The blade irons disappeared." (*Id*.).  The '757 Patent contains one claim for "[t]he ornamental design for a fan, as shown and described," and includes five figures of the Haiku fan design from all views (Doc. 128-2).[3]  Figure One is depicted below:



FIG. 1

Noble partnered with Delta T (then a fledgling fan and lighting company) to bring the Haiku fan to market and, in May 2012, the Haiku fan whirled its way onto the residential ceiling fan scene with a sales price ranging from $600 to $2,600, depending on the size of the fan and if it included a light (Second Amend. Cmplt. at ¶¶ 13-15).  The Haiku fan was so

---

[3] A Certificate of Correction was filed with the USPTO in July 2010, attaching higher quality replacement drawings (Doc. 128-2).  The replacement sheets for Figures 1-5 of the '757 Patent, obtained through the Supplemental Complex Repository for Examiners ("SCORE") database, are in the record and incorporated into the patent (Doc. 128-5; Doc. 124-2 (Wade Decl.), Ex. 2).

popular that Noble and his co-inventors spun into action and designed the L-series fan for Delta T, applying for patent protection for its design (*Id.* at ¶¶ 16-17).  The USPTO examiner initially rejected the application as being clearly anticipated by two existing models of the Haiku fan: the Haiku 5 Foot Ceiling Fan and the Haiku With Sense Me-Black fan (Wade Decl., Ex. 5 at 4-6).  The examiner also rejected the application as being "clearly anticipated by U.S. PG-PUBS document US 20110165002 A1," another patent application filed by Noble and assigned to Delta T, and because the L-Series design was "unpatentable" over the '757 Patent: "[t]he claim in [the '757 Patent] has design characteristics that are basically the same as those of the claimed design." (*Id.* at 7-9).

But Delta T successfully contested this decision, arguing that details "readily visible to the ordinary observer" distinguished the L-Series fan design from the prior art, including the '757 Patent.  Delta T presented the examiners with higher quality images of the Haiku fan models and the patented designs (Wade Decl., Ex. 7 at 4).  The USPTO reconsidered its decision and issued Patent No. D770,027 S (the "'027 Patent") on October 25, 2016 (Doc. 128-3).  The '027 Patent contains one claim for "[t]he ornamental design for a fan, as shown and described," and includes eight figures from different views (*Id.*).  Figure One of the '027 Patent is shown below (the red lines depict the claimed features):



Figure 1, '027 Patent

Next, on January 16, 2018, Noble and his co-inventors obtained Patent No. D808,004 (the "'004 Patent"), a continuation of the '027 Patent, for just the center rotor design of the L-Series fan as depicted in six figures, the first of which is reproduced below (the claimed elements are shown in red) (Doc. 128-4):



Figure 1, '004 Patent

Noble and his co-inventors assigned the '727 Patent, the '027 Patent, and the '004 Patent (among others) to Delta T in 2018 (Doc. 128-6, -7, -8). Delta T sells its Haiku and L-series fan models direct to customers on its website.

Meanwhile, Defendant Dan's Fan City is a Florida-based ceiling fan distributor that sells fans at its corporate-owned stores, at independently owned stores that use the Dan's Fan City name, on its website, through third-party retailers like Home Depot and Lowe's, and on third-party websites like Amazon (Hibbeln Decl. at ¶¶ 2, 4). Defendant TroposAir is an affiliated entity with the same ownership structure and corporate headquarters as Dan's Fan City (Hibbeln Depo. at 20:24-21:2).[4] Neither entity manufactures fans. Instead, they have a longstanding relationship with non-party Furn Fan Corporation ("Furn Fan"), a Chinese fan manufacturer (*see* Hibbeln Depo. at 28:11-20; Hibbeln Decl. at ¶ 4).

---

[4] The two companies are family-owned and, in the words of president Dan Hibbeln, "we treat the two companies the same." (Hibbeln Depo. at 46:1). He continued, "So the Dan's Fan City website sells all the products. So it's not separated TroposAir, at that point, from Dan's Fan City. It's just Dan's Fan City. Now, when it's sold to Home Depot or Lowe's, that's more of a TroposAir-only sale." (*Id.* at 46:2-6).

On a trip to Furn Fan's warehouse and showroom in Taiwan in late 2014, Dan's Fan City's president Dan Hibbeln ("Hibbeln") saw for the first time two fans: Plaintiff's Haiku fan and a prototype of what later became the Vogue Fan (Furn Fan called it the Satiny fan until Dan's Fan City renamed it), which Furn Fan owner Robin Fan had designed with his team (Hibbeln Depo. at 30:6-8, 22-24, 59:13-14, 61:20-22, 127:6-13). The prototype was three-bladed and sleek, and Robin Fan told Hibbeln he designed it to look like Delta T's Haiku fan (*see id*. at 32:7, 22-24, 63:24-64:6). Hibbeln knew that Delta T had patented the Haiku fan's design (*Id*. at 63:24-64:6). Robin Fan was concerned about infringing Delta T's design patent; Dan's Fan City was not, because of differences between the patents and the design of the Vogue fan and because the market had numerous instances of similar prior art. (*Id*. at 64:12-17, 147:21-148:10).

When Hibbeln returned to Florida from Asia, the companies emailed about when the Vogue fan would be available for market, changes Furn Fan intended to make to the Vogue Fan's design, and if Dan's Fan City would be the exclusive dealer or if Furn Fan would offer the Vogue fan to competitor LampsPlus as well (Hibbeln Depo., Ex. 23).[5] Defendants knew the Vogue fan looked similar to the Haiku fan, although Defendants had no input into the Vogue fan's design (Hibbeln Depo. at 31:22-32:1, 71:22-24). In a November 2014 email from Robin Fan to Lori Udovich ("Udovich"), Dan's Fan City's office manager and head of purchasing, Robin Fan wrote about the Satiny (soon-to-be Vogue) fan, "[t]his is a fan similar to Haiku fan of Big Ass. We have worked this fan for almost two years for avoiding infringe

---

[5]  The companies decided that Dan's Fan City and Tropos Air would be the exclusive dealers of the Vogue fan; Furn Fan does not sell the Vogue fan to any other company (Hibbeln Depo. 70:1-4, 113:19-21).

its design patent." (Hibbeln Depo., Ex. 23) And, "[t]he biggest concern is Haiku fan has two strong patent on it, (one is the original no light version, the other is with LED) – We are working very hard on 'How to avoid infringe Big Ass patent.'" (*Id.*)

Despite this, Hibbeln testified that "Dan's Fan City was more concerned about the nine mechanical patents … And we felt there was prior artwork and that we already had fans oursel[ves] that would take that fan out of the picture from being protected from artwork-wise, and that they had nine mechanical patents on the fan. And that was [Dan's Fan City's] concern." (Hibbeln Depo. at 64:4-17). In early 2015, Dan's Fan City asked Furn Fan to send it a computer model comparison of the Vogue fan and the Haiku fan. Udovich asked, "Can you show us the differences with cosmetics on this model & the Big Ass Fan model with the computer." (Hibbeln Depo., Ex. 58). Eventually satisfied with the specifications of the fan, in January 2016, Defendants began selling the Vogue fan to customers for $499.99. Dan's Fan City's website describes the Vogue fan as having "elegant contours and clean lines … The compound curved blades flow almost seamlessly from the compact motor hub, with shadow lines offering just a hint of structure to its otherwise fluid-like shape." (Hibbeln Depo., Ex. 14). A photograph of the Vogue fan included in Defendants' marketing material is below:



Delta T got wind of this new fan and, one month later, sent Dan's Fan City a cease and desist letter, writing that "it has come to our attention that your company is offering for pre-order ceiling fans strikingly similar in appearance to those sold by [Delta T]. Specifically, reference is made to the TroposAir Vogue 60" DC Ceiling Fan." (Hibbeln Decl., Ex. A) Dan's Fan City responded in late February 2016, stating that "its investigation of your allegations leads it to conclude that it has not infringed any of Delta T's design patent or trademark rights," because of "marked differences between the designs protected by [Delta T's] patents and the Vogue design, considered in light of the prior art." (*Id*. at Ex. B). Dan's Fan City included examples of prior art, including some of Delta T's own fan models. After receiving Delta T's cease and desist letter, Dan's Fan City continued selling the Vogue fan. As Hibbeln put it, "[w]e felt like we had done our due diligence prior with prior artwork, with the mechanical patents being followed through. And then with [Dan's Fan City's counsel's] writing them a letter and having no response, it made us feel like we were in the clear, that they were not pursuing it." (Hibbeln Depo. at 206:18-22).

Delta T's next move was to file this lawsuit in December 2018 in the District of

Maryland (the case was transferred to this Court in July 2019).  Delta T has retained two experts, Rake and Charles Mauro ("Mauro"), whose reports, attached to its summary judgment motion, were the topic of *Daubert* challenges before the District Judge (*see* Docs. 140-141, 146-147).  The District Judge denied Defendants' *Daubert* motion as to Mauro's reports and granted in part and denied in part their *Daubert* motion as to Rake's (Doc. 154).[6]  Specifically, the District Judge ruled that Rake is excluded from testifying about Delta T's lost profits and about the "ultimate legal conclusion as to whether Defendants' products infringe on Delta T's patents." (*Id*. at 26).  Rake, however, may testify "as to industrial design principles that might assist the jury in determining how an ordinary observer would perceive the ceiling fans in question, and how those design principles apply in the instant case." (*Id*. at 26-27).  In his report, Rake "compared the bottom perspective and/or bottom views of the Vogue accused design with corresponding views of the Patented Designs." (Rake Report at 12).  Rake's report includes an analysis of each of the three Delta T patents compared to the Vogue fan and the prior art identified in the patents themselves and by Defendants.

Mauro, on the other hand, designed and conducted online surveys for Delta T of potential ceiling fan purchasers (*i.e.*, ordinary observers) to gauge whether they found Delta T's patented designs substantially the same as the Vogue fan.  In denying Defendants' *Daubert* motion as to Mauro, the District Judge ruled that Defendants' concerns about the validity of the surveys go to the weight of Mauro's testimony rather than its admissibility (Doc. 154 at 24).  Mauro authored a separate expert report for each of the three Delta T design patents at issue (Doc. 128-12, -13, -14).  For summary judgment purposes, Delta T also points to

---

[6]  Plaintiff has filed a *Daubert* challenge to Defendants' expert that is pending before the District Judge (Docs. 164-67).  Defendants do not rely on their expert for summary judgment purposes.

evidence that its customers have confused the Haiku and Vogue fans and that potential customers have told its sales people they intend to buy the Vogue fan instead, because it is the same fan but cheaper.  Keith McKay, Delta T's national sales manager for the United States, testified he has "firsthand knowledge of customers telling our sales reps, I am going to purchase the Tropos product, it's available on Amazon, they already have my credit card information and to my perception, it's the same fan at a cheaper price." (Doc. 128-15 (McKay Depo.) at 17:18-22).[7]

Dan's Fan City sells two models of the Vogue fan – one with a light and one without – in three finishes: pure white, brushed nickel, and oil rubbed bronze (Hibbeln Depo., Ex. 14).[8]  Hibbeln estimates that sales of the Vogue fan comprise 1.6 to 2 percent off the company's gross annual sales (Hibbeln Depo. at 115:1-12).  Defendants do not rely on expert opinions in moving for summary judgment but lean heavily on side-by-side comparisons and prior art. As Hibbeln put it: "And if you read about Big Ass Fan's Haiku's introduction of this fan, they try to tell you that nobody else had made a fan that didn't have a clunky motor and a heavy metal blade arm." (*Id.* at 152:7-10).

Dan's Fan City's experience in the industry informed its decision to move forward with selling the Vogue fan:  "But when you're people that have been in the ceiling fan [industry] since 1979, you know that's not true, that there has been a lot of different fans make, many different styles … When we saw the [Haiku] fan, all of us had been in the business

---

[7] On one occasion, a Dan's Fan City retail store customer confused the Vogue fan with the Haiku fan.  An August 21, 2015 email from Dan's Fan City retail store in Daytona Beach to the company headquarters states, "[p]rospect for Haiku style fan came in today and asked if we have a date for arrival?" (Hibbeln Depo., Ex. 61).

[8] Defendants sell the model with a light for $599.99, and the model without a light for $499.99 (*Id.*).

for a long time knew there is going to be prior artwork.  Not a problem." (*Id*. at 152:10-18).

And, Hibbeln testified, Delta T's decision to obtain the '004 Patent "kind of argued our point

for us, that if you can tell the difference between [Delta T's '757 Patent] and [the '004 Patent],

you will definitely be able to tell the difference between our fan, that all three fans look

different." (*Id*. at 148:6-10).

Attached to Dan's Fan City's summary judgment motion are examples of prior art,

including two Chinese patents, a Taiwanese patent, and three United States patents (*see* Wade

Decl., Exs. 10-15).

## II.    ANALYSIS

Summary judgment is appropriate if all the pleadings, discovery, affidavits, and

disclosure materials on file show there is no genuine disputed issue of material fact, and the

movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a) and (c).  The

existence of some factual disputes between the litigants will not defeat an otherwise properly

supported summary judgment motion; "the requirement is that there be no *genuine* issue of

*material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is material

if it is a legal element of the claim that may affect the outcome under the substantive governing

law.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  A dispute about a material

fact is "genuine" if a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S.

at 248.  In determining whether a genuine dispute of material fact exists, the court must view

the evidence and all factual inferences drawn therefrom in the light most favorable to the non-

moving party and must resolve any reasonable doubts in the non-movant's favor.  *Skop v. City*

*of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mtn. Park, Ltd. v. Oliver,* 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson,* 477 U.S. at 252).

Under 35 U.S.C. § 171, "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." Unlike utility patents, "[a] design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995). Design patent infringement is a question of fact that the patentee must prove by a preponderance of the evidence. *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1129 (Fed. Cir. 2019); *Lentek Int'l, Inc. v. Sharper Image Corp.*, 164 F.Supp.2d 1302, 1306 (M.D. Fla. 2001). Determining whether a design patent has been infringed is a two-part test: (1) the court construes the claim to determine its meaning and scope; and (2) the fact finder then compares the properly construed claim to the accused design. *Lanard Toys Ltd. v. Dolgencorp, LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020); *Lentek*, 164 F.Supp.2d at 1304.

Regarding the first prong of the test, design patents "typically are claimed as shown in the drawings." *Egyptian Goddess, Inc. v. Swiss, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (citation and quotation omitted).  The court does not have to provide a detailed verbal description of the claimed design.  *Id*. at 679.  In fact, "the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design."  *Id*.  The Supreme Court has recognized that a design is better represented by an illustration "than it could be by any description and a description would probably not be intelligible without the illustration."  *Dobson v. Dornan*, 118 U.S. 10, 14 (1886).  Where a design contains both functional and nonfunctional elements, "the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."  *Egyptian Goddess*, 543 F.3d at 680 (citation and quotation omitted).  In other words, the scope of claims extends to only the ornamental features of the designs and not to their functional elements.  *Lanard Toys, Ltd.*, 958 F.3d at 1342.

Turning to the second prong of the test, the Court must compare the accused product to the patented design (not a commercial embodiment of it).  *Id.* at 1341; *see also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302-03 (Fed. Cir. 2010) (comparing plaintiff's patented design figures to defendant's product).  Courts then employ the "ordinary observer" test. *Egyptian Goddess*, 543 F.3d at 678 (citing *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871)). Under this test "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."  *Gorham Mfg. Co.*, 81 U.S. at 528.  This test applies to the patented design "in its entirety, as it is claimed," and "[m]inor differences between a patented

13

design and an accused article's design cannot, and shall not, prevent a finding of infringement." *Crocs, Inc.*, 598 F.3d at 1303 (citation and quotation marks omitted).

Sometimes, the claimed design and the accused design "will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear 'substantially the same' to the ordinary observer." *Egyptian Goddess*, 543 F.3d at 678.  In other words, "[w]here the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee fails to meet its burden of proving infringement as a matter of law." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015) (quoting *Egyptian Goddess*, 543 F.3d at 678).  For this first-level inquiry, the court conducts a side-by-side visual comparison; it does not require a review of prior art.  *Id*.

But where it is not obvious that the accused product or design differs from the patented design, courts refer to prior art.  *Id*.  Differences between the claimed and accused designs "that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant in the prior art." *Egyptian Goddess*, 543 F.3d at 678.

The Federal Circuit explains:

> When the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art.  If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer.  The ordinary observer, however, will likely attach importance to those differences depending on the overall effect of those differences on the design.

*Crocs, Inc.*, 598 F.3d at 1303 (internal citations omitted).  These differences "must be evaluated in the context of the claimed design as a whole, and not in the context of separate elements in isolation." *See Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1335.  It is error for a court to conduct

"[a]n element-by-element comparison, untethered from application of the ordinary observer inquiry into the overall design…." *Id.*

## A. Claim Construction

The first step for the Court is to define the scope of the claims. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384-91 (1996) (claim construction is a matter of law for the court). "In construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" *See Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002) (citation and quotation marks omitted) (abrogated on other grounds by *Egyptian Goddess*, 543 F.3d 665). Here, in keeping with *Egyptian Goddess*, the parties have stipulated that the scope of the claimed designs is limited to the ornamental features contained in the drawings attached to the patents (Docs. 76, 128-10); consequently, the Court will not attempt a detailed written description of the claims and will rely on the ornamental features shown in the drawings instead. And despite Plaintiff's suggestion (through Rake) that the top features and ceiling mount are not a relevant part of the design of the '757 Patent to an ordinary observer, this proposed construction ignores the drawings attached to the patent that depict this top view. Nothing in the '757 Patent indicates that the top features of the designs are *not* a part of the claimed design (such as broken lines that form no part of the claimed designs, *see* 37 C.F.R. § 1.152).

## B. Infringement

Next, the Court compares the properly construed claims to the accused design to determine infringement. The ordinary observer test is "the sole test for determining whether a design patent has been infringed." *Egyptian Goddess*, 543 F.3d at 678. Here, Plaintiff insists

15

that no reasonable juror could find that the claimed patents and the accused design are *not* substantially similar, while Defendants maintain that no reasonable juror could find they *are* substantially similar.

### 1.  '757 Patent

To determine whether the '757 Patent and the Vogue fan are substantially similar, "the proper comparison requires a side-by-side view of the drawings of the patent design and the accused products." *Crocs, Inc.*, 598 F.3d at 1304.  A side-by-side view of the designs from the top is shown here:



**View from the top**:  '757 Patent, Fig 4                    Vogue Fan

Applying the ordinary observer test, the Court concludes that a side-by-side comparison reveals there is no genuine dispute that the claimed and accused designs are plainly dissimilar.  No reasonable juror could find that a consumer might be deceived into purchasing the Vogue fan believing it to be the patented design.  They simply do not look alike other than they are both residential ceiling fans with three airfoils with rounded edges and a central hub (the part of the fan that houses the motor).  Similarity at this conceptual level cannot demonstrate infringement.  Comparing the ornamental features of the designs'

components "at the proper level of granularity," the dissimilarities between the designs are plain. *Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1337.

First, viewed from the top, the '757 Patent has a sculpted cover obscuring the down rod connecting the fan to the ceiling. The Vogue fan, on the other hand, has an exposed, straight down rod with two circular mounts: one connecting the down rod with the fan's hub and a second, larger one attaching the fan to the ceiling. The Vogue fan has a circular hub with vent holes visible from above. The patented design, by contrast, does not have vent holes, and its hub appears integrated into the airfoils – think of the patented design's hub as a three-way intersection rather than the roundabout look of the Vogue fan's hub.

The shape of the blades viewed from above is different too, which helps explain the difference in the hubs' appearances. The '757 Patent's airfoils taper only slightly where they intersect with the hub, while the Vogue fan's airfoils, which curve out from the tip, narrow sharply as they approach the hub. This creates more of a distinction between the blades and the hub on the Vogue fan (hence the roundabout). Both designs have curved blades, but the patented design's blades appear chunkier, with rounded edges. The Vogue fan's blades, with sharper edges, are slenderer (more like a pinky finger to the '757 Patent's thumb).

Next is a side-by-side view from the bottom:



**View from the bottom**:  '757 Patent, Fig. 5          Vogue Fan

Viewed from the bottom, the '757 Patent's hub appears flush with the blades; the Vogue fan's hub protrudes. The patented design has one small hole in the center of the hub. The Vogue fan's hub is a distinct circle with a smaller circle – not a hole – at its center. Looking up from below, the Vogue fan's blades appear to twist slightly as they narrow toward the hub. The '757 Patent's blades are much straighter and create the impression of almost having no hub at all. Overall, the patented design has both fewer sharp angles and fewer curves.

Finally, side views of the two designs are below:



Side View:    '757 Patent, Fig.1                    Vogue Fan

Side View:    '757 Patent, Fig.2                    Vogue Fan

Side View:    '757 Patent, Fig.3                    Vogue Fan

From the side, besides the differences already described, the '757 Patent's airfoils and hub make a single plane in profile. Figure 2 of the patented design resembles a Stealth fighter,

while in Figure 3, which is an end-on view of an airfoil, the blades appear to curve up slightly toward the ceiling.  The Vogue fan has a bigger footprint in profile:  its hub protrudes down from the blades rather than appearing flush with them.  The twist in the blades mentioned above means the Vogue fan has less of a wing-like look in profile.

Considering the impact of these differences in the overall designs – differences that are apparent to an ordinary observer viewing both the claimed and the accused designs side-by-side – the Court need not proceed past the first prong of the infringement analysis.  *See Ethicon Endo-Surgery, Inc.,* 796 F.3d at 1335 ("Where the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee fails to meet its burden of proving infringement as a matter of law.").  No reasonable juror could fail to see these differences, and no reasonable juror could fail to understand that the Vogue fan differs from the patented design.  Simply put, "no amount of extrinsic evidence can change" that the dissimilarities far exceed the similarities when comparing the Vogue fan to the '757 Patent.  *See Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC,* 411 F. Supp. 3d 975, 987 (N.D. Cal. 2019) (quoting *Colida v. Nokia, Inc.*, 347 F. App'x 568, 571 (Fed. Cir. 2009)).  And, although the Court considers Plaintiff's experts' factual analysis of the similarities and differences in the designs, "expert testimony 'cannot create a material issue of fact, where [a] visual comparison reveals that the alleged infringing [design] is not substantially similar to the [patented] design.'"  *See Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, No. 3:15-cv-849-J-34PDB, 2019 WL 1304290, at *15 (M.D. Fla. Mar. 19, 2019) (*aff'd* 958 F.3d 1337 (Fed. Cir. 2020)) (citation and quotations omitted); *see also Dorman Prods., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 683 (E.D. Pa. 2016) (noting that "[t]he ordinary observer is not an expert in design"; there is no such thing as an expert ordinary observer).  The undersigned recommends that Plaintiff's summary judgment motion

(Doc. 129) be denied as to the '757 Patent and Defendants' summary judgment motion (Doc. 124) as to the '757 Patent be granted.

### 2.   '027 Patent

A side-by-side comparison of the bottom views of the '027 Patent and the Vogue fan is below (the red lines outline the patented features):



View from Bottom:   '027 Patent, Fig. 1                   Vogue Fan

Applying the ordinary observer test, unlike with the '757 Patent, these two designs are not plainly dissimilar; the Court proceeds to the second stage of the infringement analysis and relies on prior art to provide a frame of reference.  The closest prior art before the Court are the '757 Patent and U.S Patent No. D612,476 S (the "'476 Patent"), both of which are owned by Plaintiff.  Although each side presents additional prior art for the Court's consideration (and the '027 Patent itself cites over 300 prior art references), they agree these two patents are prior art to the '027 Patent.[9]  A side-by-side comparison of the '027 Patent, the '757 Patent, and the Vogue fan is depicted below:

---

[9]  The Court considered all the prior art submitted by the parties but includes only the most similar prior art in this Report and Recommendation for brevity's sake.



A side-by-side comparison of the '027 Patent, the '476 Patent, and the Vogue fan is here:



The issue is whether an ordinary observer, familiar with this prior art, would be deceived into believing that the Vogue fan is the same as the '027 Patent. Plaintiff argues that the primary characteristics of the '027 Patent and the Vogue fan are not found in the prior art – that the '027 Patent and the Vogue fan are visually closer to each other than either is to the prior art, confirming that the claimed and accused designs are substantially similar. In support, Plaintiff relies on Rake and Mauro's expert reports. Rake "reviewed well over 300 prior art references cited on the face of the '027 Patent and the alleged prior art identified by the Defendants." (Rake Report at 21). Explaining why an ordinary observer would regard

the accused design as closer to the claimed design than the prior art, and in particular the '476 patent (which he identified as the closest prior art), Rake states that the prior art lacks the surface continuity, seamless transitions, and large center hub found in both the '027 Patent and the Vogue fan (*Id.* at 22).

Mauro surveyed 300 prospective ceiling fan purchasers, showing them different views of the '027 Patent and the most relevant prior art for the '027 patent selected by Lance Rake. Then, he assigned half of the survey takers to a test group and asked them to complete tasks, comparing either the patented and accused designs or the patented design and prior art. The other half of survey takers were the control group who compared the patented design to either a control design or prior art. According to Mauro, 78.76% of survey takers assigned to the test group thought that the patented and accused designs were substantially the same, and "a statistically significant proportion of the sample confused the accused design for the patented design." (Mauro Report on '027 Patent at 39, 43). Specifically, Mauro concluded:

> One can infer that a statistically significant majority of the population of ceiling fan consumers from which the sample was drawn (a) views the patented and accused Vogue design to be more similar in visual design compared to the patented design and the most relevant prior art, (b) views the patented and accused Vogue design as 'substantially the same' and (c) confused the accused design for the patented design, indicating that the 'resemblance … of the two … is such as to deceive an observer to purchase one supposing it to be the other.' The results of the online survey indicate that an 'ordinary observer' of ceiling fans would find the accused Vogue design to be substantially the same in overall appearance as the patented '027 design in view of the relevant prior art, and thus infringing.

(Mauro Report on '027 Patent at 12).

Defendants counter that "[i]f anything, the design of the '027 Patent bears a much closer resemblance to the design of Delta T's other patents … than it does to the design of the Vogue Fan." (Doc. 124 at 22). Defendants offer images of prior art and ask the Court to

compare them against the '027 Patent and the Vogue fan.  Recalling that the USPTO rejected Delta T's initial application for the '027 Patent, Defendants contend that the ordinary observer in this case is more sophisticated than the average ceiling fan consumer because the differences between the '757 Patent and the '027 Patent were difficult for even the patent examiner to discern at first.  So – Defendants' argument goes – considering the prior art, an ordinary observer would notice subtle differences between the claimed and accused designs.  Also, there is Hibbeln's testimony that "[w]e feel there is prior artwork and they will not win" (Hibbeln Depo. at 147:17-18), and "[i]t's hard to come out with a ceiling fan now that somebody hasn't had something prior.  So when we saw the fan, all of us had been in the business for a long time knew there is going to be prior art.  No problem." (Hibbeln Depo. at 152:14-18).  Defendants assert that "the ordinary observer, who is capable of distinguishing between those other patented designs assigned to Delta T, would not be deceived into purchasing a Vogue Fan believing it to incorporate the design of the '027 Patent." (Doc. 124 at 22).

Against this backdrop and faced with competing summary judgment motions, the undersigned finds there is a genuine dispute of fact on infringement of the '027 Patent. The '027 Patent and the Vogue fan share a broad design concept – they are both ceiling fans with three airfoils and a circular hub with a smaller circular cap.  But there are differences between the ornamental features of the designs.  For example, the width and the contouring of the blades differs between the two designs:  the '027 Patent has wider blades that do not narrow appreciably before intersecting with the hub.  The Vogue fan's blades are slenderer, narrower, and twist slightly before the hub.  So, on the one hand, Plaintiff has not shown as a matter of law that an ordinary observer, familiar with the prior art, would be deceived into believing

the Vogue fan is the same as the '027 Patent. A reasonable jury could conclude that an ordinary observer would believe the Vogue fan creates a different overall visual impression from the designs depicted in the '027 Patent. Plaintiff's expert reports, without more, do not compel the Court to find otherwise. On the other hand, Defendants, by simply referring to prior art, have not offered sufficient evidence for the Court to find there is no infringement as a matter of law. At bottom, reasonable jurors could disagree as to how an ordinary observer would perceive the two designs overall. Plaintiff and Defendants' cross-summary judgment motions as to the '027 Patent should be denied.

### 3. '004 Patent

Last up is the '004 Patent, which is Delta T's patent over the circular hub design of the L-series fan. Here are side-by-side views of the '004 Patent and the Vogue fan (with the claimed features of the patented design depicted in red):



**View from Bottom**: '004 Patent, Fig. 1        Vogue Fan

**View from Bottom**: '004 Patent, Fig. 2        Vogue Fan

Based on these comparisons, the Court finds that the accused and claimed designs are not plainly dissimilar and proceeds to the second prong of the infringement analysis. The closest prior art to the '004 Patent is the '476 Patent and Patent No. US 8,770,949 B2 (the "'949 Patent"), another Delta T patent. These are depicted below:



'949 Patent

FIG. 1A

'476 Patent

FIG. 2

Both the accused and claimed designs are circular hubs divided into three curved segments with equally spaced radial lines extending from a smaller circular center. The outer circle of the claimed design is not complete; it curves inward in three places. The outer circle of the Vogue fan's hub, in contrast, is complete – *i.e.*, it is convex where the '004 Patent is concave. But the ordinary observer test is not an element-by-element comparison. *See Lanard Toys Ltd.*, 958 F.3d at 1343. The Court must compare the overall design of the '004 Patent with the overall design of the Vogue fan and consider how the ornamental differences in each element impact the ordinary observer's perception of the overall designs. *Id.* at 1343-44 (citation omitted). Arguing the Vogue fan and the '004 Patent are substantially similar, Plaintiffs again rely on Mauro and Rake's expert opinions, which review prior art and survey potential ceiling fan purchasers. Defendants lean on the images of the accused design, the '004 Patent, and the prior art. On this record, neither party has convinced the Court of their

position by a preponderance of the evidence. How these differences in the ornamental aspects of the two designs impact an ordinary observer's perception of the overall designs is a question of fact for the jury. The parties' cross-motions as to the '004 Patent should be denied.

### C. Willfulness

Plaintiff also seeks summary judgment on its willful infringement claims.[10] Under 35 U.S.C. § 284, "the court may increase damages [for patent infringement] up to three times the amount found or assessed" by the finder of fact for willful infringement. Such enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement analysis." *Halo Elec., Inc. v. Pulse Elec., Inc.*, __ U.S. ___, 136 S. Ct. 1923, 1932 (2016). "The sort of conduct warranting enhanced damages … [is] willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate." *Id*. "[S]uch damages are generally reserved for egregious cases of culpable behavior." *Id*. There is no rigid test for when enhanced damages are appropriate, but rather "courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount" in an "exercise [of] their discretion." *Id*. at 1933-34. Questions of fact related to willful infringement must be proven by a preponderance of the evidence. *Id*. at 1934.

Even assuming Plaintiff had proven infringement as a matter of law (as explained above, it has not), it is not entitled to summary judgment on willful infringement. According

---

[10] Interestingly, Delta T has stipulated that "it will not make any claim for monetary damages, including any claim for Delta T's lost profits, provided for or allowed under 35 U.S.C. § 284." (Doc. 162, Parties' Stipulation on Limine Matters). Considering that Plaintiff is not seeking money damages under 35 U.S.C. § 284, the parties dispute whether Plaintiff can submit its willfulness claims to the jury (*see* Doc. 179 at 22, Joint Pretrial Statement). The undersigned does not decide this issue.

to Plaintiff, because Defendants continued to sell the Vogue fan after receiving Plaintiff's cease and desist letter, their conduct was willful.  This argument overlooks that Defendants' counsel responded to the cease and desist letter by citing prior art and arguing the Vogue fan is not substantially similar to the Haiku fan design; the cease and desist letter identified four Delta T patents, only one of which is at issue in the case (the '757 Patent); and Plaintiff did not follow up with Defendants after receiving their response until it filed this case almost two years later.  On this record, Plaintiff has not proven willful infringement by a preponderance of the evidence; its motion should be denied.

## III.    CONCLUSION

For the reasons stated above, it is **RECOMMENDED**:

1. Plaintiff's Motion for Summary Judgment (Doc. 129) be denied.

2. Defendants' Motion for Summary Judgment (Doc. 124) be granted at to Counts One and Four of Plaintiff's Second Amended Complaint (Doc. 65) and denied as to all other counts.

**IT IS SO REPORTED** in Tampa, Florida, this 10th day of May, 2021.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to the proposed findings and recommendations or request an extension of time to do so.  28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.  Failure of any party to timely object in accordance with the provisions of § 636(b)(1) waives that party's right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3-1.

cc:   Hon. Virginia M. Covington

28